Carlos GONZALEZ, M.D.,
et al., Plaintiffs,

v.

The CITY OF NEW YORK, Health
& Hospitals Corporation, et
al., Defendants.

No. CIV.A. 98–CV–6930DGT.

United States District Court,
E.D. New York.

March 28, 2001.

Ambrose W. Wotorson, New York City, for plaintiffs.

Barbara G. Lifton, Assistant Corporation Counsel, New York City, for non-union defendants.

Richard M. Betheil, Pryor Cashman Sherman & Flynn LLP, New York City, for union, Doctors Council.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiffs, a group of physicians who work or formerly worked at Woodhull Medical Center ("Woodhull"), brought this action for age discrimination in violation of New York Human Rights Law ("NYHRL") against the City of New York (the "City") as well as New York City Health & Hospitals Corporation ("HHC"), Medical Associates of Woodhull d/b/a/ Woodhull Medical Group ("WMG"), and certain individuals associated with one or more of these entities (collectively, the "non-Union Defendants"). Plaintiffs also allege violations of 42 U.S.C. §§ 1983, 1985 and state law breach of contract. In addition, plaintiffs allege that their union, Doctor's Council (the "Union"), failed to fairly represent them in this matter, tortiously interfered with their contract rights, breached its fiduciary duty, breached its contract with the plaintiffs, and conspired with the other defendants to discriminate against the plaintiffs in violation of § 1985. Both the Union and the non-Union Defendants now move for summary judgment as to all of the plaintiffs' claims.

In response to the present motion, the plaintiffs voluntarily withdrew their state law breach of contract and tort claims as well as their § 1985 claims against all of the defendants, leaving only their § 1983 and NYHRL claims against the non-Union Defendants and their NYHRL and duty of fair representation claims against the Union.

## Background

WMG is a New York corporation which operates Woodhull. All of the doctors working at Woodhull are employees of WMG and are paid by WMG. The terms of this employment are set forth in a collective bargaining agreement between WMG and the Union which was originally ratified in 1987 and most recently renewed in 1998. All of the plaintiffs are or were doctors working in the Woodhull Emergency Department (the "Woodhull ED").

In 1997 and 1998, approximately 77% of the patients admitted to Woodhull were admitted through the Woodhull ED (28,-000 of 36,000 total patients). Of these, approximately 60% arrived by ambulance (17,000 of 28,000). Over 90% of the patients who arrived by ambulance in these years were brought by ambulances operated through the City's 911 system, which is operated by the Fire Department of New York ("FDNY"). Hence, approximately 42% of the total patients admitted to Woodhull from 1997 to 1998 (15,000 of 36,000) were brought to that hospital by FDNY ambulances.

Hospitals which receive patients carried by FDNY ambulances through the 911 system must meet certain requirements. Hospitals that are able to meet these requirements and are approved to receive FDNY ambulances are known as Ambulance Destination Facilities. As of December of 1994, one requirement of all Ambulance Destination Facilities was that all doctors in the emergency departments at the hospitals be board-certified. Board certification involves passing a medical exam in the doctor's area of specialty. Under the FDNY guidelines, a doctor working in the Emergency Department of an Ambulance Destination Facility is required to be board-certified in Emergency Medicine, Internal Medicine, Surgery, Pediatrics, or Family Practice within five

years of graduation from medical school. Lifton Decl., Ex. C.

In 1997, FDNY learned that some Woodhull ED physicians were not board-certified. After initially threatening not to renew Woodhull's status as an Ambulance Destination Facility, on December 4, 1997, FDNY agreed to defer this decision until September 1, 1998. Accordingly, all doctors in the Woodhull ED were required to be board-certified by that date, and the Union was informed of this requirement. At that time none of the plaintiffs were board-certified.

Under the collective bargaining agreement in existence at the time, all the plaintiffs had been protected by a "grandfather clause" which exempted them from having to be board-certified. However, that agreement expired in August of 1998, and as a result of FDNY's insistence that all Woodhull ED doctors be board-certified, WMG refused to include that grandfather clause when negotiating the new collective bargaining agreement.

Plaintiffs objected to the removal of the grandfather clause and asked the Union to contest its removal. Several of the plaintiffs further urged the union to challenge the imposition of a board-certification requirement in general, and sent a memorandum in May of 1998, requesting that the Union file a class action suit against WMG and HHC. The Union did not file any grievance or lawsuit contesting the removal of the grandfather clause, and as a result the clause was removed from the 1998 collective bargaining agreement. *Id.* None of the plaintiffs filed an individual grievance under the collective bargaining agreement at that point, or at any other time.

Through negotiations with WMG, however, the Union was able to extend the grandfather clause through August 31, 1998. Under this extension, all plaintiffs would be retained after that date provided that they had passed the boards or had taken the boards and were awaiting the results. Those who had not passed or taken the boards were to be terminated.

One of the plaintiffs, Dr. Carlos Gonzalez, took and passed the boards and was re-appointed as a doctor at Woodhull in 1998. Dr. Gonzalez remained employed at Woodhull throughout the relevant time frame and is still employed there. Four other plaintiff doctors took all or part of the medical boards by August of 1998 but failed.[1] These doctors were all retained beyond August 31, pending the results of the examination, but were terminated in November of 1998 after receiving notice that they had failed. One of these four, Dr. Eduardo Santos, retook the board-certification exam in August of 1999 and passed. Dr. Santos regained his position at Woodhull as a result.

The remaining five plaintiffs neither applied for nor took any portion of the boards.[2] On July 31, 1998, these five doctors were given thirty days notice, and were subsequently terminated either on August 30, 1998, or August 31, 1998. All plaintiffs were given at least thirty days notice of their impending discharge. Dr. Edward Fishkin, Medical Director of Woodhull, states in his affidavit that there were no positions available at the time at Woodhull to which the plaintiffs who were terminated could have been transferred.

According to the Woodhull Medical Staff bylaws, which the defendants claim were

---

1. These doctors were: Eduardo Santos, Mohammed Mottaghian, Adriana Vives, and Franceorme Novembre.

2. These doctors were: Soroja Singa, Africa Bondac, Darrell Oberlin, Michael Opaku, and Jean Auguste.

distributed to all Woodhull doctors, any employee who receives notice of his or her termination may apply for a hearing to contest that termination decision. The plaintiffs deny receiving these bylaws, and, possibly for that reason or because they thought such an appeal would be futile in light of the FDNY requirements, none of the plaintiffs requested such a hearing.

As a result of their terminations, plaintiffs brought the present suit, alleging discrimination on the basis of age, denial of due process, and various state law claims. The Woodhull ED staff had approximately forty-five physicians. The average age of the ten plaintiffs at the time of their termination was 56.3 years.[3] Wotorson Aff., Ex. 19. The average age of the physicians hired to replace the plaintiffs was 38 years. The average age of the physicians employed in the Woodhull ED in September of 1998 who were board-certified was 45.3 years, see id., and after new physicians were hired to replace the plaintiffs the average age of doctors working in the Woodhull ED was 44 years.

### Discussion

#### (1)

#### Claims against the City

Preliminarily, the City argues that it should not be a party to this action. This argument is premised on the assumption that the plaintiffs included the City as a defendant because of its relationship with HHC. The City argues that it does not operate HHC, and the two entities are legally distinct. Because HHC is named as a defendant and can be sued in its own right, and because the City does not employ or have any other relationship with the plaintiffs, there is no reason for the City to be a party to this action.

Plaintiffs concede that HHC is a legal entity distinct from the City, and do not appear to dispute that the City is not an employer in this case. Instead, they explain that the reason the City is a defendant is because the City, through FDNY, imposed the board-certification requirement in dispute in this case. Where FDNY is sued, plaintiffs argue, the City is the proper defendant.

One problem with this explanation, however, is that the City's role in implementing the FDNY requirements is not included in the complaint at all. To the contrary, in listing the parties in the complaint, the plaintiffs explain that:

> Defendant, CITY OF NEW YORK (hereinafter "the City") is a municipality duly incorporated under the laws of the State of New York. The City of New York operates the Health and Hospitals Corporation and Medical Associates of Woodhull, P.C. d/b/a/ Woodhull Medical Group and it employed or currently employees plaintiffs. It may sue and be sued . . . .

Lifton Decl., Ex. A (Amended Complaint), ¶ 13. Similarly, throughout the complaint the City is mentioned solely with respect to its connection to HHC, not for any role it played in implementing the original FDNY standards. This would appear to be inconsistent with the plaintiffs' current position, suggesting that the present explanation was not the reason for including the City in the original complaint.

In any event, even if the plaintiffs' current position is accepted, plaintiffs' claims against the City are without merit. In their response to the present motion, the plaintiffs do not make any claims against the City beyond stating that they were terminated as a result of the FDNY regu-

---

**3.** It should be noted that there is no evidence as to whether the plaintiffs were the only Woodhull ED physicians terminated for not being board-certified.

lation, which they argue was imposed by the City. They concede that the City is not the plaintiffs' employer, so they are no longer arguing that the City is liable under NYHRL. Accordingly, it would appear that they could only make either an equal protection or due process challenge to the validity of the FDNY board-certification requirement under § 1983.

### a. Equal Protection

■ Although the complaint does not allege such a claim, the plaintiffs now appear to challenge the FDNY regulation on the grounds that it is age discriminatory. Such an allegation can be read as an attempt to state a claim based on the equal protection clause of the Fourteenth Amendment. *See Spain v. Ball*, 928 F.2d 61, 62 (2d Cir.1991). Regardless of whether this claim, like plaintiffs' other discrimination claims, would be based on the classification of age or some other non-suspect classification, it would be subject only to rational basis review. *Id.*

Assuming plaintiffs have attempted to plead such an allegation based on the classification of age, it fails. The plaintiffs' evidence of discriminatory impact with respect to age is limited to the effects that the policy had at one hospital, Woodhull. The City, through FDNY, did not adopt this policy solely at Woodhull, however. The policy was adopted with respect to all hospitals which wish to accept FDNY ambulances. The plaintiffs offer no evidence on the impact of the board-certification requirement citywide, and have thus failed to provide any statistically significant evidence that the impact of the City's adoption of the board-certification requirement was discriminatory on the basis of age.

The only other classification that could be reasonably inferred from the plaintiffs' complaint and evidence—that the statute impermissibly discriminates against "non-certified doctors"—would undoubtedly pass the rational basis test. Where a classification is not drawn along suspect lines, it can be overturned only when there is no rational relationship between the classification and some legitimate governmental purpose. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). The government need not articulate this relationship, but rather the classification is presumed to be constitutional, and the burden falls upon the party challenging the classification "to negative every conceivable basis which might support it." *Id.* at 320, 113 S.Ct. at 2643 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)). If there is any conceivable state of facts that could provide a rational basis for the classification, it must be upheld, even if it is based solely on "rational speculation unsupported by evidence or empirical data." *Id.* (quoting *Federal Communications Comm'n. v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2098, 124 L.Ed.2d 211 (1993)).

Under these standards, discriminating against "non-board-certified" doctors is not violative of the equal protection clause. Plaintiffs' only evidence of a lack of rational basis is their allegation that New York State Department of Health chose not to adopt a board-certification requirement for emergency room physicians statewide. In doing so, the Department of Health issued a "Regulatory Impact Statement" which stated that the Department had:

> conduct[ed] a literature review and reviewed surveillance, complaint, and incident reporting data. These reviews failed to establish a link between board-certification or admissibility and patient care or outcomes. Whether requiring only board certified or admissible emergency services physicians to function as

attending physician [sic] July 1, 1993 would improve patient care or resolve any alleged current shortcomings in care is, at best, debatable and undocumented.[4]

Pl. Mem., p. 24.

This piece of evidence is insufficient to prove that there is no rational basis for the implementation of a board-certification requirement on Ambulance Destination Facilities· in New York City. As explained above, all that is necessary is that the classification be rational, the government need not support its conclusion with any empirical evidence. There is no indication in the record as to what studies the state relied upon, and no indication of whether there are contrary studies available. Plaintiffs, who have the burden of proof on this issue, have failed to supply the court with any actual data to prove that the citywide implementation of a board-certification requirement was unjustified or unwarranted, let alone irrational or arbitrary. On its face, demanding higher credentials for emergency room physicians would seem to be a perfectly reasonable action. The New York Department of Health's conclusory statement in 1993 that the relationship between board certification and patient care was "at best, debatable and undocumented," standing alone, does not render the imposition of that requirement by the Fire Department irrational.

To the contrary, it would appear that there is a clearly rational connection between board certification and the qualifications of Ambulance Destination Facilities. The board-certification process requires physicians to take various examinations which, at a minimum, test their medical knowledge. To be sure, the fact that the regulations do not limit board certification to Emergency Medicine, but instead allow certification in Emergency Medicine, Internal Medicine, Surgery, Pediatrics, or Family Practice, does lead one to wonder how close a relationship there is between such certification and the ability of the emergency department to treat patients arriving by ambulance. Nevertheless, there can be little dispute that requiring that a doctor pass such a test is rationally related to that doctor's knowledge in his or her field. Thus, the requirement of board certification is rationally related to providing knowledgeable doctors to patients transported by FDNY ambulances.

Therefore, the plaintiffs' equal protection claims against the City must fail whether they are based on age or any other non-suspect classification. The City's motion for summary judgment as to plaintiffs' equal protection claim is granted.

### b. Due Process

Plaintiffs also allege due process violations in their complaint against the City. Presumably, although not articulated in their papers to any degree, plaintiffs are arguing that they were deprived of due process when the board-certification requirement was adopted. They argue that the City's implementation of the board-certification requirement has foreclosed the plaintiffs' ability to find future employment because the requirement has put a significant "roadblock" in their career path because they were, and continue to be, unable to find employment as emergency room doctors. Accordingly, they argue

4. Plaintiffs provide a copy of this statement, but do not provide any indication of where, how or why it was distributed or published. Nonetheless, the defendants do not dispute that this statement was issued by the Department of Health, and, accordingly, despite the inability of this court to verify its source or accuracy, it will be assumed to be what the plaintiffs claim it to be-a statement by the Department of Health in 1993.

that they have been deprived of a liberty interest without due process.

■ Where the government does more than merely terminate an individual from his or her present job, and actually forecloses an entire occupational field, that decision must comport with the due process and equal protection clauses of the Fourteenth Amendment. *See Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In *Schware*, an individual applying to take the New Mexico state bar exam was denied permission to do so because of his past arrests and membership in the communist party. *Id.* at 238, 77 S.Ct. at 756. The Court held that where a governmental decision deprives an individual of the ability to practice his or her profession, that decision must comport with due process. *Id.*

■ The present case is distinguishable from *Schware*, however, on two grounds. First, the plaintiffs here are not foreclosed from anything. They can take the boards, and if they pass, all of the doors that are presently closed will open. The plaintiff in *Schware* was denied permission even to take the bar examination because of events which occurred in his past-e.g. past arrests and past membership in the communist party. Thus, he was truly foreclosed from his ability to seek employment as an attorney. *Id.*

In contrast, however, an employee is not deprived of a liberty interest when his future employment faces obstacles "lying within the employee's power to correct." *Russell v. Hodges*, 470 F.2d 212, 217 (2d Cir.1972) (Friendly, J.). For example, in *O'Neill v. City of Auburn*, 23 F.3d 685, 691–93 (2d Cir.1994), the Second Circuit held that a termination resulting from charges that an employee had "poor relationships" with state agencies, and his work was not "up to par" and "sloppy" did not violate the employees liberty interest

because these shortcomings were within the employee's power to correct. *Id.*

In the present case, plaintiffs do not allege that older doctors are unable to pass the boards or that they are somehow prevented from attempting to do so. To the contrary, five of them have not even made the effort to try to pass, and two of the five plaintiffs that did make such an attempt, did pass. Moreover, those that have failed are not prevented from making another attempt, just as Dr. Santos successfully did. In the event that they remain unable to pass, they are not prevented from working as emergency room doctors in hospitals which do not accept FDNY ambulances, or in departments other than the emergency department in any hospital. Thus, the City has not put up any "roadblock" in the career path of the plaintiffs that they are not capable of removing themselves. Accordingly, they have not been deprived of any liberty interest, and cannot properly make a due process claim. *See id.*

The second distinction between *Schware* and the present case is that *Schware* involved a governmental decision not to allow one specific individual to practice his chosen profession. The present case involves a regulation generally applicable to all emergency room departments which receive FDNY ambulances. Such a regulation is clearly within the government's police power to protect public health or safety, and is not subject to this type of due process challenge. *See Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889). In *Dent*, the Court held that the implementation by a state of statutes governing the qualifications one must have to practice medicine is within the state's police power, and subsequent modification of those statutes does not give rise to a due process challenge. *Id.* at 123–24, 9 S.Ct. at 233–34. "[L]egislation is not

open to the charge of depriving one of his rights without due process of law, if it be general in its operation upon the subjects to which it relates and is enforceable in the usual modes established in the administration of government with respect to kindred matters." *Id.* at 124, 9 S.Ct. at 234. Thus, a statute prohibiting practice of a profession without certain qualifications is valid unless it is "arbitrary or [an] unreasonable attempt[ ] to exercise the authority vested in the public interest." *Graves v. Minnesota,* 272 U.S. 425, 47 S.Ct. 122, 71 L.Ed. 331 (1926); *see also Bi–Metallic Invest. Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915) (generally applicable statutes not subject to procedural due process challenges).

As discussed above, the board-certification requirement is not arbitrary. To the contrary, it is a reasonable attempt to ensure the qualifications of physicians who wish to practice emergency medicine. As such, the City's motion for summary judgment as to plaintiffs' due process claims is granted.

### (2)

### Remaining non-Union Defendants

#### a. § 1983 Claims

##### 1. State Action

With respect to plaintiffs' due process claims against the remaining non-Union Defendants, the defendants argue first that the actions in the present case do not constitute state action. Conceding that HHC is a state actor, they argue that WMG was the entity which terminated the plaintiffs, not HHC. Similarly, they claim that the actions of WMG are not fairly attributable to the state because the only real connection between HHC and WMG is that HHC funds WMG and provides some oversight of Woodhull. Defendants point out that state funding and regulation of a private entity alone is insufficient to transform the actions of that entity into state action without showing that the state exercised its power to bring about the specific allegedly unconstitutional actions. *See Tavoloni v. Mount Sinai Med. Center,* 984 F.Supp. 196, 200–04 (S.D.N.Y.1997). Because, the defendants argue, the ultimate decision to terminate the plaintiffs was made by the private entity, WMG, and the plaintiffs cannot establish a connection between HHC's involvement at WMG and the termination of the plaintiffs, they cannot establish state action as required for § 1983 claims based on the Fourteenth Amendment.

Where, as here, the actions complained of were those of a private actor, these actions may, nonetheless, be said to be those of the state if the actions are "fairly attributable" to the state. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999). In order to satisfy this requirement, a plaintiff must establish a "sufficiently close nexus between the State and the challenged action." *Id.* at 52, 119 S.Ct. at 986 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). This nexus can be established by showing that the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786. Alternatively, if the government has "so far insinuated itself into a position of interdependence with [the private actor] that it was a joint participant in the enterprise," the actions of the private actor may be deemed those of the state. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357–58, 95 S.Ct. 449, 456–57, 42 L.Ed.2d 477 (1974). Finally, a private entity that is exercising powers that are "traditionally

the exclusive prerogative of the State" may be found to be acting as a state actor. *Id.* at 353, 95 S.Ct. at 454.

Plaintiffs in the present case argue that a "close nexus" exists between HHC's influence over WMG and the plaintiffs' terminations. Specifically, plaintiffs allege that HHC effectively compelled WMG to terminate the plaintiffs by removing the plaintiffs' privileges. *See American Mfrs.,* 526 U.S. at 52, 119 S.Ct. at 986 (explaining that a close nexus can be found where there is compulsion); *Blum,* 457 U.S. at 1003–05, 102 S.Ct. at 2786 (same); *Leeds v. Meltz,* 85 F.3d 51, 54 (2d Cir.1996); *Myron v. Consolidated Rail Corp.,* 752 F.2d 50, 54–55 (2d Cir.1985).

■ Under the close nexus test, a private entity which is regulated or funded by the state may be deemed a state actor where there is a close nexus between the regulation or funding and the allegedly unconstitutional actions by the private actor. "Extensive regulation and public funding, either alone or taken together," are not sufficient to deem the actions of the private entity those of the state, there must be evidence of a connection between the government involvement and the challenged action. *Leeds,* 85 F.3d at 54. Moreover, "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum,* 457 U.S. at 1004–05, 102 S.Ct. at 2786.

■ In support of their theory of state action under this analysis, plaintiffs point to a number of factors. In establishing the initial connection between HHC and WMG, they explain that HHC and WMG share several administrators in areas of personnel and hiring, that HHC substantially funds Woodhull, that HHC has final decision-making authority to appoint or terminate the WMG emergency room physicians, that the plaintiffs all entered into a "delineation of privileges" with HHC, and Woodhull's bylaws, rules and regulations must be approved by HHC. In attempting to establish the "close nexus" between these facts and the actions complained of in the present case, plaintiffs point out that HHC is responsible for approving the credentials of the physicians hired at WMG, that certain administrators with important roles in the personnel practices of Woodhull held positions with both HHC and WMG, and, most importantly, that HHC took a direct role in depriving the plaintiffs of their hospital privileges. Accordingly, plaintiffs argue that these facts create a genuine issue of material fact as to whether the plaintiffs' termination can be deemed to be the result of state action. Although plaintiffs have failed to connect some of the factors listed above with the their terminations, thus rendering them only potentially relevant to this discussion, the plaintiffs' argument on the whole is persuasive.

Many of the factors listed above, while indicative of potential for government intrusion, fall short of showing any actual governmental impact on the decision to terminate the plaintiffs. *See, e.g., Myron,* 752 F.2d at 54 (rejecting state action theory despite extensive government involvement in private entity because plaintiff failed to adduce evidence that government actually played a role in his termination). For example, the fact that HHC may fund Woodhull, and the fact that HHC is involved in regulating the hospital are not determinative if the plaintiffs cannot connect these facts to their terminations. *Leeds,* 85 F.3d at 54.

On the other hand, the plaintiffs do show some involvement by HHC in the decision not to renew their privileges. For example, a memorandum dated May 26, 1998

from Dr. Luis Marcos of HHC lists seven of the plaintiffs' names, stating:

On behalf of the New York City Health & Hospitals Corporation's Board of Directors, the following physicians have been conditionally granted reappointment through August 31, 1998, pending the results of their board certification exams. If these physicians fail their boards or if the FDNY cites Woodhull for violations of this requirement, their reappointment will automatically be terminated.

Wotorson Aff., Ex. 13. Similarly, in a memorandum dated August 25, 1998, Dr. Marcos states that several physicians in the Emergency Department were still not board-certified, jeopardizing Woodhull's status as an Ambulance Destination Facility, and "the Corporation [HHC] will not tolerate such a risk." *Id.*, Ex. 15A. Finally, in a memorandum dated September 29, 1998, Dr. Marcos states that four of the plaintiffs will be conditionally granted reappointment, pending the results of their board examinations. *Id.*

These memoranda create a strong inference of a close nexus between Woodhull's connections with HHC and the decision not to renew plaintiffs' privileges. It was the loss of these privileges which directly led to the plaintiffs' terminations. Granted, the defendants are correct that the ultimate decision to terminate the plaintiffs, as opposed to reassigning them to a different department, was made by WMG.

However, in light of the defendants' own argument that such reassignment was not feasible, as a practical matter, the removal of the privileges is what occasioned the plaintiffs' terminations. Hence, at a minimum, an issue of fact exists as to whether the decision to terminate the plaintiffs can be fairly attributed to the state. Consequently, the non-Union Defendants' motion for summary judgment on the ground of lack of state action is denied.[5]

### 2. Due Process

■ The non-Union Defendants originally argued that the plaintiffs have failed to establish that they were deprived of any property or liberty interest as a result of their termination. At oral argument, however, the defendants conceded that the plaintiffs, at a minimum, had a property interest in a renewal of their privileges. Because the removal of these privileges by HHC is what occasioned their termination—the defendants conceded that the plaintiffs would not be retained without their privileges—there is no real dispute that they were deprived of a property interest as a result of state action.

In addition to this property interest, plaintiffs also argue that they were deprived of a liberty interest in future employment. Under certain circumstances, a decision not to rehire an employee can violate a liberty interest that the employee has in the ability to pursue his or her

**5.** Plaintiffs make an additional argument for state action based on the implementation of the FDNY standards. Specifically, the board-certification requirement was adopted by a City agency, FDNY, which compelled WMG to adopt the board-certification requirement by threatening to stop sending FDNY ambulances to the hospital. Although the issue need not be addressed, it should be noted that state action cannot be founded on this ground alone because state action requires establishing both that the actions complained of were taken pursuant to a rule imposed by the State and that "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982). Thus, finding that the FDNY requirement caused the termination only responds to the first inquiry, the question remains whether the party making the decision to terminate the plaintiffs can fairly be said to be a state actor.

profession. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564 at 572–73, 92 S.Ct. at 2706–07, 33 L.Ed.2d 548. This only occurs, however, when the reasons given for not rehiring the employee "seriously damage his standing and associations in his community." *Id.* at 573, 92 S.Ct. at 2707. For example, if the employee is not rehired because of alleged dishonesty or immorality, or the explanation for the decision in some other way damages the employee's "good name, reputation, honor or integrity," that decision may be found to deprive an employee of a liberty interest. *Id.* (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)).

Plaintiffs argue that as a result of their discharge they have been "stigmatized" as "unqualified" emergency room doctors, and cannot obtain employment in any emergency department that accepts FDNY ambulances. This argument is without merit. First, it is their lack of credentials that is preventing them from becoming employed as emergency room doctors, not any "stigma" or reputational injury they suffered as a result of their termination. As explained above, it is completely within their power to remove this hindrance, and, in any case, they are still qualified to work in other hospitals or other, non-emergency departments. Second, there can be no "reputational injury" because the statement that they are "unqualified" is undeniably true-there is no dispute that they do not have board certification, thus they are not "qualified" to work in an emergency department which accepts FDNY ambulances. Where charges resulting in the decision not to rehire an employee are true, the publication of those charges does not trample a liberty interest of the employee, even if the charges are damaging to the employee's ability to seek future employment. *See Codd v. Velger,* 429 U.S. 624, 97 S.Ct.

882, 51 L.Ed.2d 92 (1977) (plaintiff has no liberty interest and no due process claim unless charges against him or her are false); *see also Brandt v. Board of Cooperative Educ. Servs.,* 820 F.2d 41, 43 (2d Cir.1987) (same). Thus, plaintiffs have no due process rights based on this liberty interest.

■ Although they were not deprived of a reputational liberty interest, the plaintiffs have, nonetheless, been deprived of the property interest in their current job based on the loss of their privileges, as described above. Because this deprivation occurred under the color of state law, viz., by HHC's involvement, the plaintiffs were entitled to due process.

The non-Union Defendants argue that, even if the plaintiffs were deprived of a property interest, they were provided with due process. They explain, and the plaintiffs do not deny, that each of them had the opportunity for a full evidentiary hearing prior to their discharge, both through a grievance with the Union and through a hearing with the hospital. The plaintiffs had nearly a year's notice that they would be required to take and pass the boards and were all given thirty to sixty days notice of their impending termination, yet not one filed an individual grievance or requested a pre-termination hearing. Finally, the defendants point out that all the plaintiffs had the opportunity to pursue a post-termination article 78 hearing, and this is sufficient post-termination due process protection.

Plaintiffs respond by arguing that a pre-termination grievance or hearing would likely have been futile in light of HHC policy and in light of the Union's intransigence. In addition, because they had to begin studying for the boards, they argue, it would have been impossible to simultaneously grieve the requirement. They fur-

ther point out that the due process violations in the present case occurred as a result of municipal practice, thus making an Article 78 post-termination proceeding a wholly inadequate remedy. *See Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877 (2d Cir.1996) (post-deprivation hearing is not adequate due process where property deprivation results from "established state procedures," as opposed to random, unauthorized acts by state employees).

Initially, it needs to be reiterated that many of the plaintiffs never applied for or took the boards at all. Accordingly, at a minimum, one or more of them could have grieved the imposition of the board requirement or requested a pre-termination hearing; the argument that they did not have time to take advantage of these opportunities to be heard because they had to study for the boards is not only conclusory, but also disingenuous.

Moreover, the Second Circuit has repeatedly held that a grievance procedure in a collective bargaining agreement is generally sufficient to satisfy due process, and the failure to take advantage of that procedure forecloses a due process argument. *See Narumanchi v. Board of Trustees of Connecticut State Univ.*, 850 F.2d 70, 72–73 (2d Cir.1988) (due process is provided by grievance procedure absent showing that procedure was inadequate); *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir.1987). Indeed, in *Narumanchi*, the court held that the plaintiff's "failure to submit to the grievance procedures precludes consideration of the fairness of those proceedings in practice." *Narumanchi*, 850 F.2d at 72.

The plaintiffs cannot now complain of futility where they were given nearly a year's notice and did not make any effort to be heard. The assertion that such a grievance would have been futile is simply conclusory. Although it does appear that the Union would have had very little leverage in light of the fact that the board-certification requirement was being imposed on WMG and HHC, at a minimum one or more of the plaintiffs could have alerted the Union to their perception of discriminatory impact.[6] Perhaps this action would have prompted some other response from the Union. For example, through a grievance procedure the Union could have pressed for reassignment or some other alternative to termination. The plaintiffs' claims that nothing would have been done are based only on their subjective belief-they never filed a grievance to attempt to find a solution or to voice their specific objections. Plaintiffs were entitled to notice and the opportunity to be heard-the due process clause does not entitle them to a hearing at which they are guaranteed a likelihood of success.

Similarly, plaintiffs had the opportunity to be heard prior to their termination by asking for a hearing with the hospital itself. Hospital guidelines allowed for such a procedure, and even assuming that the plaintiffs were unaware of this procedure, as they claim to have been, they never sought to be heard. If they had done so, more than likely they would have been alerted to the availability of the hearing procedure. As with the grievance procedure, plaintiffs had the opportunity to be heard, and they failed to take advantage of it.

As a result, plaintiffs were not deprived of due process, and summary judgment is granted as to all of their § 1983 due pro-

---

**6.** The memorandum sent by plaintiffs to the Union requesting a class action suit does not give any grounds for such action beyond a desire to preserve the plaintiffs' jobs.

cess claims.[7]

### b. Discrimination Claims

#### 1. Disparate Impact

■ The heart of the plaintiffs' complaint is their disparate impact claim under NYHRL.[8] The claim is based on the fact that the average age of the doctors terminated for lack of board certification was approximately 57, and the average age of those hired to replace them was 38.

The first step in any disparate impact claim is a prima facie showing by the plaintiffs that a facially neutral employment practice had a significantly discriminatory impact. *Connecticut v. Teal*, 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Smith v. Xerox Corp.*, 196 F.3d 358, 364–65 (2d Cir.1999).[9] This showing can be made by either: 1) showing a gross statistical disparity, or 2) showing a statistically significant adverse impact coupled with other evidence of discrimination. *See Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370, 1375 (2d Cir.1991). The statistical evidence is probative if it "reveals a disparity so great that it cannot be accounted for by chance." *Waisome*, 948 F.2d at 1374. Moreover, this evidence must show that the employment practice disproportionally affected the plaintiffs' class, i.e. older doctors in the present case—merely showing an imbalance in the workforce overall does not satisfy this element. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656–57, 109 S.Ct. 2115, 2124–25 (1989).

If the plaintiff can establish a prima facie case, the defendant must then make a showing of a legitimate business necessity for the challenged employment practice. *Xerox Corp.*, 196 F.3d at 365.[10] If the employer can do so, the employee can still prevail if he is able to show that there are other, equally effective methods for accomplishing that same goal which would lessen the discriminatory impact, or he is able to show that the offered reason was a mere pretext for discrimination. *Id.* at 365; *Waisome*, 948 F.2d at 1374.

---

7. Plaintiffs did not allege a violation of the equal protection clause against any of the non-Union Defendants. However, *supra* at 1(a), the potential claim with respect to the City was discussed. Although, theoretically, a similar discussion could be included with respect to the remaining non-Union Defendants, the issue of age discrimination is fully evaluated under the NYHRL-an evaluation which requires greater scrutiny than the rational basis analysis available under the equal protection clause. Thus, because, as discussed *infra* at 2(b), plaintiffs have failed to raise a genuine issue of fact with respect to the NYHRL, the same would be all the more true of any hypothetical equal protection claims.

8. Plaintiffs have not made any claims under the ADEA.

9. Because NYHRL age discrimination law follows that under the ADEA, *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001), cases under the latter act will be utilized.

10. Under Title VII, the employer must prove both that the employment practice was "job related" and that it was consistent with a "business necessity." 42 U.S.C. § 2000e 2(k)(1)(A)(i) (1994). Arguably, the employer in the present case has failed to meet its burden of proving that board certification is "job related," having presented no direct evidence connecting board certification to job performance. However, the Second Circuit has yet to apply both of these factors to the ADEA. *See, e.g., Xerox Corp.*, 196 F.3d at 365 (requiring only that employer prove "business necessity" of employment practice). Even if the same analysis were to apply with respect to age discrimination claims, in the present case the hospital had no choice but to adopt the requirement in question. It is not clear under these circumstances whether the burden of establishing the "job related" requirement could be placed on WMG or HHC in light of the fact that they did not choose the standard in question.

The non-Union Defendants first argue that the statistical comparison offered by the plaintiffs is not sufficient to establish a prima facie case. They correctly note that the proper comparison would be between the ages of those terminated as compared to those retained as a result of the practice in question. *See Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir.1980).[11]

Much of the plaintiffs' statistical evidence relating to new hires is irrelevant to this comparison. The fact that younger employees were hired may be relevant to discriminatory intent, but it does not show discriminatory impact. In this regard, however, the plaintiffs do allege that the average age of all of the emergency room physicians at Woodhull is 44. This number is somewhat probative in that it would seem to indicate that the physicians retained were, on average, younger than those terminated. The probative value is minimal, however, because the average age of 44 includes physicians who were hired subsequent to the plaintiffs' termination, whose average age was 38. Nowhere do the plaintiffs explain what the average age was of the physicians who were not terminated as a result of the imposition of the board-certification requirement. In other words, plaintiffs have failed to even argue that the physicians who were board-certified, and thus not terminated, were younger than those who were terminated. As a result, the defendants are correct that the plaintiffs do not rely on data of any real statistical significance for their disparate impact claim, and cannot establish a prima

facie case based on the evidence they attempt to utilize.

■ The plaintiffs and defendants, however, have both included lists of Woodhull ED physicians which shed some light on the proper comparison group. Using the list submitted by plaintiffs, the average age of the physicians who were employed as of August 31, 1998 and who were board-certified was 45.3 years. Wotorson Aff., Ex. 19. One possible problem with this number, however, is that the list provided is not dated, and it is, therefore, not clear which of these physicians were board-certified as of August 31, 1998—the date the first group of plaintiffs was terminated-or as of November of 1998—when the second group of plaintiffs was terminated. A second problem is that neither party explains whether the plaintiffs comprise all of the physicians who were terminated as a result of failing to become board-certified. Thus, the court is left without any valid statistics to compare the impact of the board-certification requirement on physicians of different ages. Consequently, plaintiffs have failed to meet their burden of establishing even a prima facie case of discrimination, and summary judgment is appropriate on this ground alone.

Even assuming that a prima facie case of disparate impact were set forth, plaintiffs' case would ultimately fail due to plaintiffs' inability to rebut the defendants' justification for the imposition of the FDNY requirement.

After the plaintiffs meet their burden of presenting a prima facie case of dis-

---

11. Although the average age of physicians not impacted by the FDNY requirement is over 40, and would, therefore, not be part of the "unprotected" class under the ADEA, NYHRL does not contain a cut-off point at age 40. To the contrary, NYHRL protects all employees over the age of 18. N.Y. Executive Law § 296(3 a)(a) (McKinneys Supp.2001). Thus, although research has found no decisions directly addressing this distinction, it will be assumed that it is sufficient under NYHRL to find disparate impact on older doctors, and it is not necessary to find discriminatory impact based strictly on the 40 year-old brightline standard under the ADEA.

crimination, the burden then falls upon the defendants to show that they had a legitimate business justification for the imposition of the board requirement. *Xerox Corp.*, 196 F.3d at 365. There is no dispute in this case that WMG and HHC each had a legitimate interest in implementing the board-certification requirement-if they did not, the hospital would lose over 40% of its incoming patients. Having done so, plaintiffs must prove that there were other, less discriminatory means of accomplishing the same goal and, as a result, the proffered reason was merely a pretext for discrimination.

Under these circumstances, it would seem to be impossible for the plaintiffs to prove that the proffered reason, i.e. the desire to remain eligible to receive FDNY ambulances, was merely a pretext for discrimination. Under this theory, the plaintiffs would have to assume that WMG was not compelled to adopt the requirement, but chose to do so as a means of discriminating against older physicians.

In an attempt to prove this, plaintiffs adduce two pieces of evidence. First, they assert that the hospital will lose money because federal medicare and medicaid regulations forbid hospitals receiving those funds from tying privileges solely to board certification. *See* 42 C.F.R. § 482.12(a)(7).[12] From this, the plaintiffs infer that WMG was actually not acting in its own financial interest by adopting the board-certification requirement, and, therefore, a jury could infer a more invidious motive.

Defendants do not respond to this point, but it is of no matter because the argument is unsupported. The plaintiffs do not set forth any evidence that Woodhull was or is in jeopardy of losing medicare or medicaid funds. The regulation forbids the tying of staff membership "solely" to board certification. In the present case, the plaintiffs' termination was primarily based on the potential loss of FDNY ambulance patients. This fact may very well protect the hospital from sanction. In any event, the plaintiffs present no evidence of which loss—medicaid and medicare or FDNY ambulances—would be more costly. The hospital could very well have determined that the loss of FDNY ambulances would be more detrimental to its financial well-being than the loss of federal medicaid and medicare. Even if no determination had been made, however, the hypothetical speculation that the hospital may lose medicaid and medicare funds in the future does not render the decision to comply with FDNY standards in the interim a "pretext for discrimination." Consequently, the plaintiffs have presented no evidence that shows that the decision to adopt the FDNY standards was anything but a business necessity. The unrebutted evidence is that Woodhull would lose a large portion of its income if it did not adopt the FDNY requirements, and this was the reason for imposition of the board-certification requirement.

The second argument the plaintiffs make in an attempt to show pretext is that the hospital could have reassigned the plaintiffs to another department instead of simply terminating them. In other words, plaintiffs argue that a less discriminatory method existed by which WMG could retain its FDNY Ambulance Destination Facility status without terminating any of the plaintiffs. *See Waisome*, 948 F.2d at 1374. In essence, the plaintiffs are left clinging to the accusation that WMG's decision to

**12.** The regulation provides that "... under no circumstances is the accordance of staff membership ... in the hospital dependent solely upon certification, fellowship, or membership in a specialty body or society." *Id.*

adopt the board-certification requirement was not discriminatory, but the decision to terminate the plaintiffs, as opposed to reassigning them, was discriminatory.

Plaintiffs' evidence in this regard is simply insufficient. They point to two memoranda from Van H. Dunn of the HHC in which he recommended that three physicians, Drs. Matthew Negari, Michel Antoine, and Darrell Oberlin [13] be reassigned due to their lack of board certification. *See* Wotorson Aff., Ex. 4; Lifton Decl., Ex. F. From the fact that HHC was willing to attempt to accommodate these three doctors, the plaintiffs conclude that reassignment was a viable option for all of the plaintiffs.

To the contrary, however, the only evidence in this case is that reassignment was not an option. First of all, none of those three doctors in the memoranda was ever reassigned. Dr. Negari, who was 58 at the time, eventually passed the boards and was reappointed as an Emergency Department doctor. Non Union 56.1 at ¶ 21. Dr. Oberlin, who was 50 at the time, was not reappointed or reassigned. *Id.* at ¶ 33. It appears that Dr. Antoine, who was 55 at the time, was never reassigned and was eventually terminated in February of 1999, but the reason for his termination is not clear. Wotorson Aff., Ex. 19. Thus, the plaintiffs' evidence does not suggest that reassignment was feasible.

Further, the non-Union Defendants have submitted an unrebutted affidavit from the Medical Director of Woodhull Hospital, Dr. Edward Fishkin, in which he states that there were no positions available to which any of the plaintiffs could be reassigned. Fishkin Aff., ¶ 7. Because the plaintiffs have not adduced any evidence of available positions, they have failed to meet their burden of proof that there was a less discriminatory method by which the defendants could accomplish their business goal. Accordingly, the non-Union Defendants' motion for summary judgment as to the plaintiffs' NYHRL claims is granted.

## 2. Disparate Treatment

Plaintiffs also attempt to state a claim for disparate treatment. In order to establish a prima facie case of intentional age discrimination, the plaintiffs must show that: 1) they are members of the protected class, 2) they were otherwise qualified for their jobs, 3) they suffered an adverse employment action, and 4) that this action was taken under circumstances giving rise to an inference of discrimination. *See Brennan v. Metropolitan Opera Assoc.,* 192 F.3d 310, 316 (2d Cir.1999). There is no dispute as to the first or third elements, as plaintiffs were older physicians who were terminated.

The defendants' first challenge is to the second element. Specifically, they argue that the plaintiffs were not "otherwise qualified" because they were not board-certified. The plaintiffs, however, are challenging that very requirement as discriminatory. To accept the defendants' position would allow an employer to discriminate freely by simply choosing job requirements that allowed it to dispose of unwanted employees. Where the only reason that an employee was not "otherwise qualified" is the very condition which the plaintiff is challenging as discriminatory, the lack of that qualification cannot prevent the plaintiff from stating a prima facie case. Accordingly, because the defendants do not allege any other deficiencies in plaintiffs' qualifications, the plaintiffs have established the second element of their prima facie case.

---

**13.** Drs. Negari and Antoine are not plaintiffs in the present case, but Dr. Oberlin is.

■ The defendants also challenge plaintiffs' evidence with respect to the fourth element, arguing that they have failed to allege circumstances that give rise to an inference of discrimination. Plaintiffs, however, have presented what has long been the quintessential piece of evidence in establishing this element—their average age was over 56 and they were replaced by physicians who averaged 38 years of age. This fact alone is sufficient to create an inference of discriminatory intent in establishing plaintiffs' prima facie case. *See Brennan*, 192 F.3d at 317 (showing that plaintiff's replacement was substantially younger can be sufficient to establish prima facie case of age discrimination); *de la Cruz v. Human Resources Admin. Dept. of Soc. Services*, 82 F.3d 16, 20 (2d Cir.1996). Therefore, the plaintiffs have met their de minimus burden of establishing a prima facie claim of intentional discrimination.

■ Nonetheless, this claim ultimately fails for the same reasons that the plaintiffs' disparate impact claim fails. As discussed above, the defendants have met the burden of articulating a. legitimate, non-discriminatory reason for the plaintiffs' terminations, namely, their business interest in complying with the FDNY requirements in order to maintain their status as an Ambulance Destination Facility. In an attempt to rebut this proffered reason, the plaintiffs reiterate the same evidence discussed above—their perception of disparate impact, the Department of Health statement and the alleged loss of Medicare and Medicaid funding. For the same reasons that this evidence was insufficient to rebut the defendants' business justification above, it is insufficient to rebut their justification with respect to the disparate treatment claim. Thus, plaintiffs have failed to rebut the legitimate, non-discriminatory reason for the imposition of the board-certification requirement, and summary judgment is granted with respect to plaintiffs' disparate treatment claims.

### (3)

### Union Defendant

**a. Breach of duty of fair representation**

■ Plaintiffs' primary claim against the Union is that it breached its duty of fair representation (the "Duty") by failing to adequately oppose the removal of the grandfather clause from the new collective bargaining agreement.

A union has a duty to "represent fairly the interests of all bargaining unit members during the negotiation, administration and enforcement of collective bargaining agreements." *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42, 46–47, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). In *Spellacy v. Airline Pilots Assn.*, 156 F.3d 120 (2d Cir.1998), the Second Circuit held that a union breaches its Duty where its actions "can be fairly characterized as so far outside a wide range of reasonableness … that [they are] wholly arbitrary, discriminatory or in bad faith." *Id.* at 126 (quoting *Air Line Pilots Assn. v. O'Neill*, 499 U.S. 65, 75, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)); *see also Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The *Spellacy* court also cautioned that judicial review of union action "must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *Id.* (quoting *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir.1991)). Moreover, even if a plaintiff is able to establish arbitrary, discriminatory, or bad faith actions, he must still prove that those actions caused his injuries. *Id.*

Plaintiffs make two points that they argue show arbitrary or bad faith conduct on the part of the Union. First, they argue that by failing to oppose the board-certification requirement imposed on Woodhull ED doctors, the Union exposed many more doctors citywide to such a requirement. Second, they point to a memorandum dated December 13, 1999, sent by the president of the Union, Barry Liebowitz, to Kings County doctors, in which Mr. Liebowitz states that the Union attorneys "advise us that there is a potentially meritorious claim that a board-certification requirement for employment will adversely and disproportionately affect ... older doctors ..." Wotorson Aff., Ex. 36. Plaintiffs argue that this admission shows that the Union's prior decision not to pursue the class action suit that the plaintiffs had urged in May of 1998 was arbitrary and discriminatory. Wotorson Aff., Ex. 35 (memorandum from Woodhull ED doctors urging the Union to file a class action suit). The plaintiffs argue that from this evidence, a jury could infer that the Union, knowing the discriminatory impact the board-certification requirement could have and knowing the adverse impact such a requirement would have citywide, acted arbitrarily and in a discriminatory manner in failing to oppose its imposition.

This argument is without merit. Initially, the plaintiffs' request was for a class action lawsuit, not a grievance. While it is true that a union may not "arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion," *Vaca*, 386 U.S. at 191, 87 S.Ct. at 903, plaintiffs never submitted a grievance. It is undisputed, in fact, that not one of them filed an individual grievance. Plaintiffs offer no authority, nor has research revealed any, that a Union must file a class action suit when requested to do so.

Moreover, even assuming that the Union could have been expected to take some action with respect to the plaintiffs' request had they known of the impact, the request for such action came a year and a half before the Union attorneys expressed any opinion that there may be a potentially meritorious suit, and more than a year before any doctor was terminated for failing to achieve board certification. Thus, the plaintiffs have adduced no evidence that, at the time the Union initially failed to pursue an action on the plaintiffs' behalf, they were acting arbitrarily or discriminatorily. At most, what they have shown is that shortly after the plaintiffs were terminated, the Union attorneys thought that the imposition of a board-certification requirement on Kings County doctors generally—not limited to Ambulance Destination Facility emergency departments, as was the requirement in the present case—may have a discriminatory impact. Even that, however, was not based on any knowledge on the part of the Union. To the contrary, the Union memorandum upon which the plaintiffs rely was sent out in connection with a survey asking for information from the doctors to determine if there would be a discriminatory impact on Kings County doctors. To date, it appears that no such determination has been made.

Plaintiffs' second claim, that the Union should have realized the discriminatory impact that would result from further regulations requiring board certification of all physicians on a citywide scale, is similarly unpersuasive. Plaintiffs present absolutely no evidence, beyond the conclusory statements of counsel, that imposition of these standards citywide would have any discriminatory effect. Even assuming that it would, however, there is no evidence that, at the time of plaintiffs' travails, any action to broaden the scope of the requirement was underway or even threatened.

The challenged standard in the present case was limited only to emergency room doctors accepting FDNY ambulances, and the plaintiffs have adduced no evidence that the Union knew or even should have known of any discriminatory impact such a requirement would have. Indeed, plaintiffs have failed to even prove that very fact for their own hospital.

Plaintiffs' limited evidence stands in the face of overwhelming evidence that WMG and HHC were not willing to bend on the imposition of the board requirement. Because the hospital was faced with such dire economic consequences if the defendants were to adhere to the grandfather clause, the Union had very little leverage. This was not a requirement imposed by HHC or WMG on a whim, as plaintiffs plainly recognize, they were compelled to do so by the FDNY requirement. Consequently, it is not clear what plaintiffs could have accomplished even if the Union did pursue some action on their behalf, and it cannot therefore be said that the failure to do so was arbitrary.

Moreover, because of these circumstances, the plaintiffs have also failed to present any evidence at all that the Union's actions, even if arbitrary, were the cause of the plaintiffs injuries. They have presented no evidence that any action taken by the Union could have been successful because they have failed to show that the board-certification requirement imposed by the City was even discriminatory. Thus, there is no evidence that a suit filed by the Union would have saved plaintiffs' jobs.

In light of the deference due to unions in this context, the plaintiffs' evidence is simply insufficient to create any reasonable inference that the Union acted arbitrarily or discriminatorily. Consequently, this evidence does not support the proposition that the Union breached its Duty to the plaintiffs, and summary judgment in favor of the Union on the plaintiffs' duty of fair representation claim is appropriate.

**b. Discrimination claim under NYHRL**

The final claim asserted by the plaintiffs against the Union is the allegation that the Union violated New York Human Rights law by failing to contest the board-certification requirement. Although the complaint does not explain the basis for such liability, in light of the fact that the Union is not an "employer" under New York Human Rights law, liability must be based on Executive Law § 296(6), which forbids "aiding and abetting" of discrimination. *See* N.Y. Exec. Law § 296(6) (McKinney's 1993) (making unlawful the aiding or abetting of "the acts forbidden under this article"). Because, as explained above, plaintiffs' claims against the non-Union Defendants are without merit, there are no acts "forbidden under [that] article," which could have been aided or abetted by the Union. *See, e.g., Sowemimo v. D.A.O.R. Security, Inc.,* 43 F.Supp.2d 477, 490–91 (S.D.N.Y.1999) (holding that liability under § 296(6) cannot attach without first finding employer liability for discrimination under NYHRL); *Rivera v. Prudential Ins. Co.,* No. 95 CV 0829 (McAvoy, CJ), 1996 WL 637555, *13 (N.D.N.Y. Oct. 21, 1996). Thus, the Union's motion for summary judgment is granted with respect to the plaintiffs' claims under NYHRL.[14]

**Conclusion**

For the forgoing reasons, the non-Union and Union Defendants' motions for sum-

---

14. The complaint also refers to the individual defendants as aiders and abettors, Compl. ¶¶ 64, 66, although neither side deals with these allegations in their memoranda. Regardless of which defendants the plaintiffs allege aided and abetted, the reasoning set forth above would foreclose any potential claims under § 296(6).

mary judgment as to all of plaintiffs' claims are granted. The Clerk of the Court is directed to close the case.